IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

PATRICK ANTHONY HEARD,

        Defendant.

CRIMINAL ACTION

NO. 1:15-CR-00245-WSD-CMS

**REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE**

Defendant Patrick Anthony Heard ("Defendant") was indicted under 18

U.S.C. § 922(g)(1) for being a felon-in-possession of a firearm.  (Doc. 1).  There

are two motions pending before the Court:  Defendant's Motion to Suppress

Statements (Doc. 17); and Defendant's Motion to Suppress Evidence (Doc. 16).

As discussed below, I **RECOMMEND** that Defendant's Motion to Suppress

Statements (Doc. 17) be **DENIED**, and that Defendant's Motion to Suppress

Evidence (Doc. 16) be **GRANTED**.

## I.      MOTION TO SUPPRESS STATEMENTS

In his Motion to Suppress Statements, Defendant asserts that if this case

proceeds to trial, the Government may attempt to introduce post-arrest statements

that he may have made.  (Doc. 17 at 1).  In response, the Government states that it

does not intend to introduce Defendant's statements at trial, and therefore Defendant's motion is moot.  (Doc. 45 at 1).  In his reply, Defendant does not disagree with the Government's position regarding the Motion to Suppress Statements, which indicates that Defendant does not disagree with the Government's position that the motion should be denied as moot and without prejudice.  (Doc. 46).  Accordingly, I **RECOMMEND** that Defendant's Motion to Suppress Statements (Doc. 17) be **DENIED WITHOUT PREJUDICE**.

## II.     MOTION TO SUPPRESS EVIDENCE

Defendant has also filed a Motion to Suppress Evidence, arguing that his Fourth Amendment rights were violated when a police officer conducted an unreasonable warrantless search of Defendant's person by pulling up Defendant's shirt and finding a handgun in the waistband of his pants.  (Doc. 16, 42).  Defendant argues that all of the evidence obtained via the unjustified search must be suppressed.  The Government responds that the gun was located during a lawful search pursuant to Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968).  (Doc. 45).

On December 9, 2015, I conducted an evidentiary hearing on this motion. (Doc. 35, Transcript ["Tr."]).  At the hearing, the Government presented one witness, John J. Bisker, an officer with the Marietta Police Department.  Defendant

2

called two witnesses: Frank Sanders, the security guard at the apartment complex where Defendant was arrested, and Defendant's mother.

Thereafter, the parties filed post-hearing briefs. (Docs. 42, 45, 46). I ordered additional briefing on a factual issue, and each side filed a supplemental brief. (Docs. 48-50). The motion is now ripe for consideration.

## A.   BACKGROUND

At the evidentiary hearing, Frank Sanders testified that on March 2, 2014, he was working as a security guard at the 1250 West apartment complex in Marietta, Georgia, when he walked past a group of three or four young men, one of whom he recognized. (Tr. at 52-53, 55). The young men walked towards a wooded area between some apartment buildings and, within three or four minutes, Mr. Sanders heard gunshots coming from that same wooded area. (Id. at 55, 57-58). Mr. Sanders approached the area to investigate, and then called 911 to report the shots. He told the 911 dispatcher that he was a security guard, he had heard shots, and he was available to meet with law enforcement to discuss the incident. (Id. at 58).

Marietta Police Officer John Bisker was dispatched to respond to the 911 call at approximately 6:45 p.m. (Tr. at 6, 45). Officer Bisker was the first officer on the scene, arriving between five and seven minutes after the dispatch call. (Id.

at 11-12, 45, 61). He drove his patrol car into the complex and spoke with Mr. Sanders. (Id. at 11, 45, 53). Officer Bisker testified that he spent approximately five to ten minutes speaking with Mr. Sanders. (Id. at 45). Officer Bisker testified that Mr. Sanders told him that he had heard gunshots coming from near Building 4. (Id. at 11). Mr. Sanders pointed out to Officer Bisker the area where he had seen the individuals walking and pointed out the general area where he heard the shots, which was near Building 4. (Id. at 11). After speaking with Mr. Sanders, Officer Bisker got back in his patrol car and slowly moved his vehicle closer to where Mr. Sanders had pointed, scanning for the possible shooter or shooters as he drove. Officer Bisker drove around for approximately five to ten minutes. (Id. at 14, 45-46, 50).

At this point, between 15 and 27 minutes after the being dispatched, Officer Bisker encountered Defendant.[1] (Tr. at 14, 45-46). Officer Bisker testified that he saw Defendant standing in a grassy area in the same general area where Sanders told him that he heard the shots. (Id. 14-16). Defendant was the only person in that area. (Id. at 50). Officer Bisker testified that he got out of his police vehicle

---

[1] Officer Bisker testified that he arrived five to seven minutes after the dispatch call. (Tr. at 45, 61). He spent between five and ten minutes speaking with the security guard. (Id. at 45). He then drove around looking for the shooter for five to ten minutes before he encountered Defendant. (Id. at 14, 45-46, 50).

and approached Defendant, who was walking a small dog, and asked him if he heard any gunshots.  (Id. at 15, 28).   In response to Officer Bisker's question, Defendant approached the officer and indicated that he had heard the shots, and he pointed in the same direction that Mr. Sanders had indicated the shots had come from.  (Id. at 16-17, 28, 46).  Officer Bisker looked in that direction but did not see anyone there.  (Id. at 17).

Officer Bisker asked Defendant where he lived and for identification. (Tr. at 16, 17).  Officer Bisker could not recall if Defendant produced an ID card or not, but Mr. Sanders, the security guard, saw the encounter and testified that he saw Defendant provide identification to Officer Bisker.  (Id. at 17, 29, 63).  According to Officer Bisker, Defendant said that he was living with his mother, who lived in the apartment complex, and pointed to a building (Building 2), but Defendant did not provide a building or apartment number.  (Id. at 17, 18, 28, 49).  Officer Bisker testified that his impression was that Defendant did not know where he lived, and he found that to be suspicious.  (Id. at 18).  Officer Bisker, however, did not testify that he ever asked Defendant to provide a specific apartment number or even a building number, only that he drew assumptions based on the fact that Defendant did not volunteer what his apartment number was.  (Id. at 17-18).  It is undisputed that Defendant answered the officer's questions and was compliant.  (Id. at 28-29,

46).   Officer Bisker testified that he had intended to pat down Defendant, but decided to wait until another officer arrived before doing so.  (Id. at 48).

During this exchange, a second Marietta Police officer, Officer Dilworth, arrived on the scene.  (Tr. at 18).  Upon arrival, Officer Dilworth moved behind Defendant and to Defendant's right side while Officer Bisker stood in front of Defendant and continued to speak with him.  (Id. at 19).  As soon as Officer Dilworth was in place, Officer Bisker asked Defendant if he had any weapons on him and for permission to pat him down for weapons.  (Id. at 29, 47).  Defendant denied consent to the search.  He asked "for what," said that he had done nothing wrong, asked why the officers were messing with him, and said he had just come outside to walk his dog and was going back inside.  (Id. at 20, 29, 47, 79).  Officer Dilworth then ordered Defendant to raise his hands and keep them where the officers could see them so that the officers could approach and pat Defendant down for weapons.  (Id. at 20).  Defendant initially complied, raising his hands as instructed, but then lowered them.  (Id. at 20-21).  Defendant raised and lowered his hands several times.  (Id.).

While Defendant was raising and lowering his hands, Officer Bisker saw Officer Dilworth (with whom he had partnered before on multiple occasions) look down at Defendant's waistband and then nod his head such that Officer Bisker

6

understood that Defendant had a weapon. (Tr. 22, 29, 30, 41). Officer Dilworth then moved his hand to the waistband of Defendant's pants and retrieved a firearm. (Tr. 22, 31).

**B.     DISCUSSION**

Under the Fourth Amendment, every search or seizure by a government agent must be reasonable. See U.S. Const. amend. IV. One type of search and seizure is the investigatory stop and pat-down. See Terry v. Ohio, 392 U.S. 1, 22-24, 88 S. Ct. 1868, 1880-82 (1968). Such brief seizures[2] by police officers fall short of traditional arrests (which require a showing of probable cause) and are subject to a lesser standard than that for arrest. Investigatory stops are lawful when justified by a reasonable suspicion that an individual is engaged in criminal activity. See id. at 21, 28-31, 88 S. Ct. at 1883-85. A pat-down, or frisk, of a suspect's outer clothing is lawful only when the officer has a reasonable belief that the detainee poses a threat to the officer's safety or the safety of others. See id. at 27-30, 88 S. Ct. at 1883-85.

---

[2] A seizure occurs when a reasonable person (1) would not feel free to leave or (2) would not feel free to decline the officers' requests or otherwise terminate the encounter. See Brendlin v. California, 551 U.S. 249, 255, 127 S. Ct. 2400, 2405-06 (2007) (internal quotation marks and citations omitted).

Reasonable suspicion of criminal activity exists when an officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." See id. at 21, 88 S. Ct. at 1880. Inarticulable hunches or generalized suspicions are insufficient. Id. at 22, 27, 88 S. Ct. at 1880, 1883. In adopting this formulation, the Supreme Court in Terry emphasized the importance of balancing "the need to search (or seize) against the invasion which the search (or seizure) entails" to determine whether a search of seizure is lawful. Id. at 21, 88 S. Ct. at 1880 (quoting Camara v. Municipal Ct. of S.F., 387 U.S. 523, 534-37, 87 S. Ct. 1727, 1735 (1967)). To determine whether reasonable suspicion existed at the time of the encounter, courts use a "totality of the circumstances" test. See Navarette v. California, __ U.S.__, 134 S. Ct. 1683, 1686-87, 1692 (2014).

The Government argues, and I agree, that an investigatory Terry stop requiring reasonable suspicion occurred at the time that the officers told Defendant to raise his hands and leave his hands where they could be seen. (Doc. 45 at 16). The Government argues that the following factors, taken together, amount to reasonable suspicion of illegal activity: (1) Officer Bisker was alone and investigating a potentially dangerous incident where shots had been fired but no shooter had yet been identified; (2) Defendant could not tell police the apartment

8

or building number where he lived; (3) Defendant implicitly admitted that he was in the area during the shooting; and (4) Defendant moved his hands in a manner consistent with having a weapon, i.e., repeatedly raising and lowering his hands after he was told to raise his hands and leave them where they could be seen.[3] (Doc. 45 at 14-17).

Applying the totality of the circumstances test, I conclude that the officers in this case did not have reasonable suspicion that Defendant was engaged in criminal wrongdoing at the time they told him to raise his hands and leave them where they could be seen.

---

[3] The parties disagree about what the record shows with respect to what happened with Defendant's hands after he moved them up and down. During his testimony, Officer Bisker testified about the "low ready" position. He explained that "low ready" is a position in which officers put their guns in response to a threat. (Tr. at 21). Officer Bisker testified that as Defendant was raising and lowering his hands, Officer Bisker drew his weapon and put it in the "low ready" position." (Id. at 22, 25). The Government interprets the testimony differently, arguing that Officer Bisker testified that it was ***Defendant*** who put his (Defendant's) hands in a "low ready" position. Defendant, on the other hand, argues that Officer Bisker was referring to the position of his own gun (Officer Bisker's gun) after the officer unholstered it. At my request, the parties filed supplemental briefs on this point. (Docs. 48, 49, 50). My understanding from listening to the testimony and reviewing the transcript of the hearing is that Officer Bisker was referring to the position of his own gun after he unholstered it. Moreover, because Defendant never touched his gun, it would not be possible to put the gun in a "low ready" position. As discussed below, however, this fact ultimately is irrelevant because all of the hand moving (including any possible movement into a "low ready" position) occurred after the crucial moment when Officer Bisker made the decision to detain Defendant and conduct a Terry stop.

I note initially that the Government's reliance upon Defendant's raising and lowering of his hands in response to the command that he raise his hands and keep them where they could be seen, could not have formed the basis for reasonable suspicion of criminal activity because the hand movements occurred ***after*** Officer Bisker elected to detain Defendant and conduct the <u>Terry</u> stop.   Removing this factor, all that is left to support reasonable suspicion is that Defendant was in an area where shots had been fired and that when asked where he lived, Defendant gave a vague answer.   These facts, when taken together with rational inferences from those facts and the other facts indicating lawful conduct, did not reasonably warrant the detention.

Based on Officer Bisker's testimony, between 15 and 27 minutes had elapsed between the time that he was dispatched and the time that he encountered Defendant, and presumably some additional time had elapsed between when the shots were fired and when the dispatch occurred.   When Officer Bisker encountered Defendant, there was nothing suspicious about him.   He was not loitering or doing anything out of the ordinary.   On the contrary, Defendant was walking a dog, a common lawful activity for someone to be doing outside of an apartment building.   Given the lapse in time and the lack of any indicia of unlawful or even suspicious behavior, the fact that Defendant was found in the vicinity of

10

the place where the shots were fired does not weigh in favor of articulable suspicion of wrongdoing.

With respect to the Government's argument that Defendant's presence at the apartment complex was suspicious because Defendant did not know where his mother lived, the testimony simply does not support it. Officer Bisker testified as follows:

Q: So you heard gunshots. What did you say to him?

A: I asked him if I could see his ID, I believe.

    * * *

Q: At this point you've asked Mr. Heard for identification. Does he have identification?

A: I don't recall if he give [sic] me an ID card or not.

Q: Did you ask him where he lived?

A: I did.

Q: And what does he tell you?

A: He said he lived in the—I said to him who's there—and his mother lived in the apartment complex. He did not give me a physical address.

Q: Did you ask him where she lived in the complex?

A: I did.

Q: And what did he say?

A:    He didn't tell me where she lived.

Q:    As in he refused to tell you or he didn't—it was—was it your sense, was it your impression, Officer, standing there having this discussion with Mr. Heard, that he was refusing to tell you or that he didn't know where she lived?

A:    As if he didn't know.

Q:    So did that—how did that strike you saying that he saying [sic] I live with my mother but was unable to tell where the apartment was.

A:    It seemed suspicious that he was there.

(Tr. at 16-18).  Later, on cross examination, Officer Bisker testified as follows:

Q:    Did he not, in fact, approach you in pursuit of his dog?

A:    He approached me as I asked him if I could speak with him.

Q:    And isn't it true that Mr. Heard stated that he lived in the apartments that he was standing near?

A:    I don't recall an address where he said he lived.

Q:    Did he not point to the building, Building 2, that he lived in?

A:    He pointed to a building and said that his mother had lived in the building.

(Id. at 28).  Thus, the testimony was that Defendant, who was walking his dog, told the officer that his mother lived in the apartment complex.  When asked where the mother lived, Defendant pointed to one of the buildings and said that his mother lived in that building.  Far from the Government's proffered characterization—that

12

Defendant "was unable to provide a building or building number" (Doc. 45 at 4) —
Defendant answered the officer's questions by pointing to the building.  There is
no evidence that the officer did any further follow-up questioning.

The officer's credibility is called into question in three ways.  First, Officer
Bisker was not forthcoming in admitting that Defendant "pointed to a building and
said that his mother had lived in the building."  He waited to offer that fact until he
was asked about it on cross-examination.   Rather than explain on direct
examination that Defendant gestured toward Building 2 in response to the officer's
question about where Defendant's mother lived, Officer Bisker chose to parrot the
prosecutor's words and testify that Defendant "acted as if he didn't know" where
his mother lived.

Second, Officer Bisker's memory was hazy about what occurred during his
brief conversation with Defendant.  As noted above, Officer Bisker testified on
direct that, "I asked him if I could see his ID, I believe."  Later, on cross-
examination, he testified that he could not remember if Defendant provided
identification or not:

Q:     And isn't it true that Mr. Heard provided ID when you asked for ID?

A:     I can't recall what kind of ID he provided.

Q:     But he provided some form of identification?

> A:     If he did not provide any solid ID, then I would have asked him for a name and a date of birth to prove who his ID was.

(Tr. 29).  Officer Bisker's lack of recall as to what transpired with respect to the identification card diminishes the value of his testimony about finding Defendant's answers to be suspicious.

Third, Officer Bisker testified that he was taught during his recent police academy training that when faced with a call reporting gunfire where the shooter is not yet identified, proper police protocol is to pat down for weapons any individuals in the area where the shots were fired, for officer safety.  (Tr. at 43, 48).  Officer Bisker testified that he had intended to pat down Defendant, but decided to wait until the other officer arrived so the pat down could be done safely. (Id. at 47-48).  This testimony suggests that Officer Bisker intended to conduct a pat down of Defendant from the first moment that he saw Defendant, even though the shooting had occurred more than 15 minutes earlier, even though Defendant had a legitimate reason for being outside of the apartment complex, and even though there was nothing inherently suspicious about him.

In analyzing the totality of the circumstances, there are numerous factors that weigh against a finding of reasonable suspicion of criminal conduct.  As noted above, Defendant was engaging in a non-suspicious activity (walking a dog) and was behaving in a non-suspicious way (walking toward the officer and

14

cooperatively answering the questions posed to him).  There were no other people around to make the situation more dangerous, and there was no evidence that the apartment complex was in a high crime area.

None of the cases that the Government cites support its position that Officer Bisker had reasonable suspicion that Defendant was engaged in criminal activity at the time that he detained Defendant.  On the contrary, those cases highlight how this case is distinguishable.  See, e.g., Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 676 (2000) (reasonable suspicion established based on the defendant's presence in an area of heavy narcotics trafficking and his unprovoked flight upon noticing the police); United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000) (police had reasonable suspicion of criminal activity sufficient to support their investigatory stop of motorist who was exiting a second time from the residence of known drug trafficker, after motorist had driven up to house carrying a backpack, briefly engaged in conversation with someone in garage, returned to her car with backpack, switched places with passenger, drove around neighborhood, returned to garage, and finally left the garage without the backpack and re-entered the car); United States v. Lara-Mondragon, 516 F. App'x 771, 773-74 (11th Cir. 2013) (unpublished) (finding that in the context of a "knock and talk," when agents approached the residence and the defendant immediately retreated into his home

and appeared to lock the door, the agents who positioned themselves alongside the residence strayed from the front door for legitimate safety reasons); United States v. Ochoa, 402 F. App'x 478, 483 (11th Cir. 2010) (unpublished) (reasonable suspicion existed to support the initial stop where information from several databases indicated that the defendant was wanted by Mexican authorities in connection with a double homicide); United States v. Smith, 201 F.3d 1317, 1323 (11th Cir. 2000) (reasonable suspicion existed to support search on a bus where suspects had appeared nervous in bus station, had engaged in whispered conversation and exchanged suitcases in the station, sat in separate locations while awaiting the boarding call in apparent attempt to conceal their association, where one of the suspects scanned and surveilled the terminal and watched every person who passed by him in the station, and where luggage originated in known source city for narcotics); United States v. Karam, 496 F.3d 1157, 1164 (10th Cir. 2007) (finding that reasonable suspicion existed where an individual driving a car lied to police officers about his route and could not provide the address of where he was going); United States v. Patton, 182 F.3d 929, 1999 WL 274404, at *2 (9th Cir. 1999) (unpublished) (finding that reasonable suspicion existed where an individual driving a car first stated that he lived in California and then stated that he actually lived in Alabama, but he did not know his address, and the passenger told a

16

conflicting story); United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993) (finding that reasonable suspicion existed where an individual driving a car appeared "panicky" and stated that the car was registered to his uncle, but then could not provide even a general address for his uncle). In this case, there was no evidence that Defendant was in a high crime area, that he fled from police, that he was wanted by the police, that he appeared nervous, that he lied about anything, or that he gave conflicting answers to any questions. To the extent that Defendant gave a vague response to one of Officer Bisker's questions, that response included a truthful gesture. The Government has simply not presented evidence sufficient to support any inference that there was anything suspicious about Defendant.

I conclude that under the totality of the circumstances, the officers in this case did not have reasonable suspicion of criminal activity to support a Terry stop or to believe that Defendant might be armed and dangerous to warrant the pat down. See Terry, 392 U.S. at 27, 88 S. Ct. at 1883. Accordingly, I **RECOMMEND** that the motion to suppress evidence (Doc. 16) be **GRANTED**.

### III. CONCLUSION

For the foregoing reasons, I **RECOMMEND** that Defendant's Motion to Suppress Evidence (Doc. 16) be **GRANTED**, and that Defendant's Motion to Suppress Statements (Doc. 17) be **DENIED WITHOUT PREJUDICE**.

I have now addressed all referred pretrial matters and have not been advised of any impediments to the scheduling of a trial.   Accordingly, this **CASE** is **CERTIFIED READY FOR TRIAL**.

IT IS SO REPORTED and RECOMMENDED, this 15th day of June, 2016.


CATHERINE M. SALINAS
United States Magistrate Judge