**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**UNITED STATES OF AMERICA,**

**v.**

**1:15-cr-245-WSD-CMS**

**PATRICK ANTHONY HEARD,**

**Defendant.**

## OPINION AND ORDER

This matter is before the Court on Magistrate Judge Catherine M. Salinas'
Report and Recommendation ("R&R") [53], recommending that Defendant Patrick
Anthony Heard's ("Defendant") Motion to Suppress Evidence ("Evidence
Suppression Motion") [16] be granted, and that his Motion to Suppress Statements
("Statements Suppression Motion") [17] be denied.

I.    **BACKGROUND**

A.    Introduction

On June 23, 2015, the grand jury issued an Indictment [1] charging
Defendant with one count of felon in possession of a firearm, in violation of
18 U.S.C. § 922(g)(1).  On July 29, 2015, Defendant pleaded not guilty to the
charge in the Indictment.  ([5]).  On August 27, 2015, Defendant filed his Evidence

Suppression Motion, seeking to suppress evidence resulting from a frisk of his person during an investigative stop by police.  Also on August 27, 2015, Defendant filed his Statements Suppression Motion, seeking to exclude post-arrest statements he made after a firearm was discovered on his person during the frisk.

On December 9, 2015, the Magistrate Judge held an evidentiary hearing ("2015 Hearing") on Defendant's motions.  ([35]).  The parties later filed post-hearing briefs and supplemental memoranda.  ([42]; [45]; [46]; [49]; [50]).  On June 15, 2016, the Magistrate Judge issued her R&R, recommending that Defendant's Evidence Suppression Motion be granted and that his Statements Suppression Motion be denied without prejudice.  On June 29, 2016, the Government filed its Objections [55] to the R&R.  On September 2, 2016, the Court adopted the Magistrate Judge's recommendation that Defendant's Statements Suppression Motion be denied, but deferred ruling on Defendant's Evidence Suppression Motion pending a *de novo* evidentiary hearing to further develop the record.  ([58]).  On November 10, 2016, the Court held an evidentiary hearing ("2016 Hearing") on Defendant's Evidence Suppression Motion.  ([69]).  Having considered the evidence presented at both evidentiary hearings, and assessed the credibility of witnesses at the 2016 Hearing, the Court is now in a position to make findings of fact and rule on the Evidence Suppression Motion.

B.    <u>Facts</u>

On the evening of March 2, 2014, Frank Sanders ("Sanders"), a security officer, was in uniform and on duty at an apartment complex at 1250 Powder Springs Street in Marietta, Georgia (the "Complex").  (Transcript of December 9, 2015 Hearing before Magistrate Judge Catherine M. Salinas ("2015 Tr.") [35] at 53, 60).  As Sanders walked to his car, which was parked in front of Building 2, three to four young men walked past him towards a wooded area between Building 2 and another apartment building.  (Transcript of November 10, 2016 Hearing before Judge William S. Duffey, Jr. ("2016 Tr.") [69] at 102-103).[1]  Sanders knew one of the men.  (2016 Tr. at 102-103).  Three or four minutes later, Sanders heard gunshots coming from the wooded area.  (2015 Tr. at 55, 58).  Sanders immediately ran towards, but did not enter, the wooded area to investigate.  (2016 Tr. at 104).  Unable to see clearly in the dark, and afraid to investigate further, Sanders dialed 911.  (2015 Tr. at 58; 2016 Tr. at 104).  He told the operator he was a security guard, he had heard gunshots, he needed help, and

---

[1]    Although Sanders thought the apartment building was labeled Building 2, and Officer John J. Bisker, IV thought it was labeled Building 4, the numbering is immaterial because the witnesses referred to the same building.  The Complex has since been renovated and renumbered.  (2016 Tr. at 12-13).  The Court, in this Opinion and Order, refers to the building at issue as Building 2.  (<u>See</u> 2015 Tr. at 81).

he would be available to meet with officers when they arrived.  (2015 Tr. at 58; 2016 Tr. at 105).  The call occurred approximately five to eight minutes after the gunshots.  (2016 Tr. at 107).

As Sanders walked back to his car after the 911 call, he saw Defendant exit Building 2.  (2016 Tr. at 105).  Sanders had never seen Defendant before, and does not recall whether they then said anything to each other.  (2016 Tr. at 105-106; but see 2015 Tr. at 59 (stating he may have briefly asked Defendant about his dog)).  Defendant was walking a small dog.  (2016 Tr. at 107).

At approximately 6:45 p.m. that night, Officer John J. Bisker, IV ("Bisker"), a patrol officer with the Marietta Police Department, was dispatched to the Complex in response to Sanders' call.  (2016 Tr. at 7).  The dispatcher told Bisker that someone reported gunshots in the Complex.  (2016 Tr. at 8).  Bisker was not given any further information.  (2016 Tr. at 8).  It was dark outside and Bisker was alone, in uniform, in a marked police car.  (2016 Tr. at 7, 33-34).  He knew the Complex had a high crime rate, and had responded to "multiple calls" there previously.  (2016 Tr. at 13).

Approximately five to seven minutes after the dispatch call, Bisker arrived at the Complex and spoke to Sanders at or near where Sanders parked his car.  (2015 Tr. at 45, 61; 2016 Tr. at 34, 107, 124).  At Bisker's request, Sanders presented his

4

personal identification.  (2016 Tr. at 109).  Sanders told Bisker he was a security officer and had heard gunshots.  (2016 Tr. at 108).  Sanders pointed towards the wooded area to show Bisker where the gunshots came from, and said he briefly investigated the area before calling the police.  (2015 Tr. at 67; 2016 Tr. at 36-37).  Sanders did not tell Bisker about his encounter with Defendant, and it is unclear whether he mentioned the group of men who walked past him moments before the gunfire.  (Compare 2015 Tr. at 27; 2016 Tr. at 11, 36, with 2015 Tr. at 62; 2016 Tr. at 108, 127; see 2016 Tr. at 65-66).  The conversation lasted approximately three to four minutes.  (2016 Tr. at 108; see also 2016 Tr. at 34).[2]

Bisker then "proceeded to patrol through the parking lot" in his car, window down, to listen for further gunshots.  (2015 Tr. at 12).  He drove slowly in the direction of the reported gunfire.  After driving for a couple of minutes, he saw Defendant standing, with a small dog, in the grass in front of the wooded area

---

[2]     At the 2015 Hearing, Bisker said that he spoke with Sanders for approximately "five to ten minutes."  (2015 Tr. at 45).  At the 2016 Hearing, he clarified that he finished speaking with Sanders approximately ten minutes after receiving the dispatch call.  (2016 Tr. at 34).  This is consistent with Sanders' testimony that their conversation lasted "three or four minutes," and that Bisker arrived at the Complex about five to seven minutes after Sanders called the police.  (2016 Tr. at 108, 123).

where the gunshots were reportedly fired.  (2016 Tr. at 14-16; see 2016 Tr. at 77).[3] Bisker did not see anyone else in the Complex, the area where Defendant stood "was probably the most remote place" in the Complex, and there was a parked vehicle, about fifteen to twenty feet away, with a smashed windshield and a stick holding open the trunk.  (2016 Tr. at 14, 83-84).

Bisker parked on a horseshoe-shaped road adjacent to Building 2, near the wooded area, and got out of his patrol car.  (2015 Tr. at 12, 14; 2016 Tr. at 16).  He approached Defendant, gun holstered, and asked him whether he had heard gunshots.  (2015 Tr. at 14-15; 2016 Tr. at 16).  Defendant said that he had.  (2016 Tr. at 17).  Bisker asked him where the gunshots came from, and Defendant pointed to the wooded area.  (2016 Tr. at 17).  Bisker did not see anyone in that area and was concerned that Defendant "may have fired into the woods or that maybe there was another person there, some reason that he may have had something to do with the gunshots."  (2016 Tr. at 17).

---

[3]     At the 2015 Hearing, Bisker said he encountered Defendant "probably five or ten minutes" after concluding his conversation with Sanders.  (2015 Tr. at 45-46, 50).  At the 2016 Hearing, Bisker testified that, after speaking with Sanders, he drove his car through the Complex for "probably just a couple of minutes."  (2016 Tr. at 14; see 2016 Tr. at 39 (referring to "a few minutes")).  It is a short distance from where Bisker spoke with Sanders to where he parked his car to engage Defendant.

Bisker asked to see Defendant's identification.  (2016 Tr. at 18).  Defendant provided Bisker with a form of identification that did not show Defendant lived in the Complex.  (2016 Tr. at 18-19, 43-44, 63).  When Bisker asked Defendant where he lived, Defendant became "defensive," did not answer the question directly, pointed to Building 2, and said his mother lived there.  (2016 Tr. at 19-20, 47).  He did not give a specific address.  (2015 Tr. at 17).  Bisker asked Defendant for his mother's apartment number to "verify that that's indeed where he was or what he was there for," but Defendant did not provide the information requested.  (2016 Tr. at 19, 70).  This led Bisker to believe "that maybe [Defendant] didn't live there or that he may have been lying that his mother lived there."  (2016 Tr. at 20; see 2015 Tr. at 18).  Bisker testified that Defendant's "mannerisms, swaying, and just his overall demeanor made me think that possibly he . . . wasn't supposed to be there."  (2016 Tr. at 20-21).

At this point, Officer Daniel Dilworth ("Dilworth"), a Marietta police officer with whom Bisker had worked previously, arrived on the scene.  (2015 Tr. at 29-30; 2016 Tr. at 22).[4]  The dispatcher told Dilworth "to provide backup to Officer Bisker on a report of discharged firearm, shots fired."  (2016 Tr.

---

[4]      At some point before Dilworth arrived, Defendant told Bisker he was walking his dog.  (2016 Tr. at 67, 97).

at 75).  The dispatcher did not provide further information but, like Bisker, Dilworth knew the Complex had a high crime rate.  (2016 Tr. at 75).  Dilworth arrived in uniform, in a marked police car, and parked in front of Bisker's vehicle.  (2016 Tr. at 22-23).[5]  He had not spoken to Sanders or anyone else at the Complex.  (2016 Tr. at 88).  After getting out of his car, Dilworth, with his gun holstered, moved to where Defendant and Bisker were standing.  (2016 Tr. at 22).  Bisker stood less than twenty feet in front of Defendant, and Dilworth stood slightly behind Defendant, about seven feet to Defendant's right.  (2015 Tr. at 19; 2016 Tr. at 20, 23, 77-78, 114).[6]  The officers positioned themselves in this "L" shape—a "safety L"—so they could "see all angles" and "in case anybody would pull a weapon."  (2015 Tr. at 19-20, 48).

When Dilworth arrived, he saw Bisker and Defendant engaged in a conversation that seemed unremarkable.  (2016 Tr. at 89).  Bisker eventually asked Defendant for permission to "pat him down" to make sure he did not have any weapons on his person.  (2015 Tr. at 48; 2016 Tr. at 21, 79).  This question

---

[5]   Dilworth testified that he parked behind Bisker's car.  (2016 Tr. at 77, 88).  Whether he parked in front of, or behind, Bisker's car is not consequential to the Court's analysis.

[6]   Dilworth implied, at points during his testimony, that he stood to Defendant's left.  (See 2016 Tr. at 91).  The side on which Dilworth stood is immaterial.

triggered a significant change in Defendant's demeanor.  (2016 Tr. at 89, 96).  He became defensive and animated, did not answer the question, and said "he had not done anything wrong."  (2015 Tr. at 29; 2016 Tr. at 68, 79, 81).  Bisker did not interpret this response to indicate consent, or refusal of consent, to search.  (2015 Tr. at 29).  Dilworth testified that Defendant's response "triggered a flag" in his mind, that Defendant seemed "opposed to answering any more questions," that Defendant looked tense and uncomfortable, and that Defendant was giving Bisker the "run-around."  (2016 Tr. at 79-80, 90, 95-96).  Defendant's hands became animated as he spoke, and Dilworth instructed him to keep his hands by his side. (2016 Tr. at 81, 89).[7, 8]

Shortly thereafter, Dilworth told Defendant to raise his hands so the officers could pat him down for weapons.  (2016 Tr. at 24, 69, 79).  Defendant again stated he had done nothing wrong.  (2015 Tr. at 20).  Defendant eventually raised his hands but "beg[an] to lower them back down towards his pockets."  (2016 Tr.

---

[7]     Dilworth testified that, instead of answering Bisker's questions, Defendant said "[m]an, why are you doing all of this?", "[y]ou don't need to be going through all of this," and "[a]nything but to define the answer to the question."  (2016 Tr. at 95).

[8]     Bisker could not recall whether Dilworth arrived before or after Bisker asked for permission to pat down Defendant.  (2016 Tr. at 51, 68-69; but see 2015 Tr. at 47-48 (stating that Dilworth arrived after Bisker asked to pat down Defendant). Dilworth testified that he was present when Bisker asked to conduct a pat down, and offered detailed information about the exchange.

at 24).  He repeated the raising and lowering of his hands several times, which made Bisker suspicious that Defendant "wanted to get his hands towards his waist to hold a weapon."  (2016 Tr. at 25, 65; <u>see</u> 2015 Tr. at 21).  Based on his "reading [of] the situation," including Defendant's rigid standing position, Dilworth believed that Defendant had a gun in the back of his waistband.  (2016 Tr. at 82, 90).[9]

Dilworth looked at Bisker and nodded at Defendant's waistband, suggesting to Bisker that Defendant "had something concealed, possibly a weapon, in a spot in the back where [Bisker] could not see."  (2016 Tr. at 26, 82).  Approaching from Defendant's front-right side, and placing a stabilizing hand on Defendant's chest, Dilworth "reached out towards [Defendant's] waistband with an open palm to touch the outer clothing."  (2016 Tr. at 27, 90-91).  "[I]mmediately recogniz[ing]" that Defendant had a firearm, Dilworth yelled "gun!"  (2016 Tr. at 27; <u>see</u> 2015 Tr. at 42).  Bisker then drew his gun and held it in a "low-ready" position, as he had been trained, for his protection.  (2016 Tr. at 27; <u>see</u> 2015 Tr. at 22).  Dilworth recovered a "firearm that [Defendant] had secreted down the back of his pants in the small of his back," and the officers took Defendant into custody.  (2015 Tr. at

---

[9]     Dilworth testified that "there was an unnatural hitch of [Defendant's] jacket in the back" but that he "didn't attribute that to a weapon at the time."  (2016 Tr. at 92).

23, 32; 2016 Tr. at 27, 61-62, 82).  Bisker's conversation with Defendant lasted

approximately four to five minutes.  (2016 Tr. at 29; <u>see</u> 2016 Tr. at 85).  "Upon

checking . . . GCIC records, it was found that [Defendant] was a convicted felon."

(2015 Tr. at 23).[10]

C.    <u>Sanders' Testimony</u>

Sanders testified at both the 2015 and 2016 evidentiary hearings, and his

testimony differs, in some respects, from the officers' testimonies.  He said

Dilworth and Bisker parked in front of Building 2 rather than on the adjacent

horseshoe-shaped street.  (2016 Tr. at 110-111)   He stated that Dilworth arrived at

the Complex and spoke to Defendant while Sanders engaged in discussion with

Bisker.  (2016 Tr. at 127-128).  He testified that Dilworth—not Bisker—asked

Defendant for identification, and that Bisker joined the conversation later.  (2016

Tr. at 128).  He said the officers' exchange with Dilworth occurred at the front

corner of Building 2, further from the wooded area than the officers said.  (2016

Tr. at 110).  He said he watched the exchange through the gap between the

officers' cars and that he "could see clearly everything that was going on."  (2016

---

[10]     After placing Defendant in handcuffs, the officers learned, for the first time,
that Defendant was wearing a colostomy bag as a result of an injury.  (2016 Tr.
at 64, 67-68; <u>see</u> 2015 Tr. at 31, 43-44).  This injury arose out of an October 2013
incident, in which Defendant was shot at a nightclub or strip club.  (2016 Tr.
at 142).

11

Tr. at 112).  Sanders testified that he stood about forty or fifty feet away from the officers' exchange with Defendant, that it was dark, and that he had difficulty hearing their conversation.  (2016 Tr. at 112, 123, 128, 132-133).  He testified that Dilworth searched Defendant's person, lifted his shirt, and found a gun in the front right side of Defendant's waistband, below Defendant's medical bag.  (2015 Tr. at 63-64, 71-72, 75; 2016 Tr. at 115-116, 133).[11]

To the extent Sanders' statements are contradicted by the testimonies of Bisker and Dilworth, the Court disregards Sanders' testimony.  Sanders was convicted in 2014 for giving a false name to police officers, and has been charged at least once—possibly twice—with failing to appear in court.  (2016 Tr. at 121-122).  He testified that he quit his job as a security guard shortly after the March 2, 2014, incident because he and his manager "got into it about [a] situation."  (2016 Tr. at 120-121).  He claims, implausibly, that he does not recall anything about the situation that prompted him to quit.  (2016 Tr. at 121).  These facts undermine the credibility of Sanders' statements.  Having listened to the

---

[11]  Sanders testified that Defendant's medical bag was "close to [Defendant's] ribs," "below his shoulder," higher than his hip, "above his waistline," not quite as high as his ribs, and that Sanders saw part of the bag when Dilworth purportedly lifted Defendant's shirt during the search.  (2016 Tr. at 117, 125, 134).

testimonies, and carefully assessed the witnesses' demeanor and delivery, the Court finds the officers credible and Sanders' testimony not reliable.

Sanders' testimony that he spoke to Bisker while Dilworth engaged Defendant is particularly difficult to believe.  It is directly contradicted by the officers' detailed testimonies that Bisker first engaged Defendant and that Dilworth arrived on the scene later.  If Sanders's assertion was true, he likely would have told Bisker that Dilworth was engaging the wrong man—that, moments earlier, Sanders saw Defendant leave Building 2 to walk his dog, that Defendant was not part of the group that walked past him, or that Defendant was not responsible for the gunfire.  (2015 Tr. at 67-68; 2016 Tr. at 136-137).  He did not do so.  It also is unlikely that Bisker would have engaged in discussion with Sanders when Defendant, apparently the only other person in the Complex, was nearby, at the location of the reported gunfire, and involved in an exchange with Dilworth.  That Sanders did not tell Bisker the information and impressions he had about Defendant further undercuts the credibility of Sanders' testimony.

## II.    LEGAL STANDARD

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59;

Williams v. Wainwright, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam).

A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). This requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party." Jeffrey S. v. State Bd. of Educ. of Ga., 896 F.2d 507, 512 (11th Cir. 1990) (internal citations omitted). With respect to those findings and recommendations to which a party has not asserted objections, the Court must conduct a plain error review of the record. United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983).

The Government objects to the Magistrate Judge's conclusion that Bisker and Dilworth "did not have reasonable suspicion of criminal activity to support a Terry stop or to believe that Defendant might be armed and dangerous to warrant the pat down." (R&R at 17; see [55]). In view of this objection, and because the Magistrate Judge did not have the benefit of hearing additional testimony at the 2016 Hearing, the Court considers Defendant's Evidence Suppression Motion *de novo*.

14

## III.   DISCUSSION

### A.   Sequestration Rule

Defendant argues that Dilworth's testimony, at the 2016 Hearing, should be stricken because Dilworth reviewed a transcript of Bisker's prior testimony, in violation of the rule against sequestration.  "At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony.  Or the court may do so on its own."  Fed. R. Evid. 615.  "The purpose of the sequestration rule is to prevent the shaping of testimony by one witness to match that of another, and to discourage fabrication and collusion."  Miller v. Universal City Studios, Inc., 650 F.2d 1365, 1373 (5th Cir. July 23, 1981).[12]  "[T]here is no difference between reading and hearing testimony for purposes of Rule 615.  Either action can violate a sequestration order."  United States v. Jimenez, 780 F.2d 975, 980 n.7 (11th Cir. 1986).  Indeed, "[t]he harm may be even more pronounced with a witness who reads trial transcript than with one who hears the testimony in open court, because the former need not rely on his memory of the testimony but can thoroughly review and study the transcript in formulating his own testimony."

---

[12]   In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit Court of Appeals issued before the close of business on September 30, 1981.

<u>Miller</u>, 650 F.2d at 1373.  The sequestration rule applies to evidence suppression hearings.  <u>See</u> <u>United States v. Warren</u>, 550 F.2d 219, 227 (5th Cir. 1977).

"[W]here the defendants have suffered actual prejudice, and there has been connivance by the witness or counsel to violate the [sequestration] rule, the court may strike testimony already given or disallow further testimony."  <u>See</u> <u>United States v. Blasco</u>, 702 F.2d 1315, 1327 (11th Cir. 1983); <u>see</u> <u>Jimenez</u>, 780 F.2d at 980 ("Striking testimony is a serious sanction, appropriate only where the defendants have suffered actual prejudice, and there has been connivance by the witness or counsel to violate the rule." (citations and internal quotation marks omitted)).

The Government invoked the sequestration rule at the 2015 Hearing.  (<u>See</u> 2015 Tr. at 51).  The Government also invoked the rule at the beginning of the 2016 Hearing.  (<u>See</u> 2016 Tr. at 4).  Dilworth testified that he prepared for the 2016 Hearing by reading the first eight or ten pages of the transcript of Bisker's 2015 Hearing testimony.  (2016 Tr. at 87).[13]  His review of the transcript occurred after the 2015 Hearing concluded but before the sequestration rule was invoked at the 2016 Hearing.  The parties did not request, and the Court did not order, that

---

[13]     It appears the Government emailed Dilworth a copy of the full transcript of the 2015 Hearing.  (2016 Tr. at 87).

witnesses be sequestered *between* the evidentiary hearings.[14]  Because there was no sequestration order in effect at the time of Dilworth's review, Defendant has not established a sequestration rule violation.  See Naismith v. Prof'l Golfers Ass'n, 85 F.R.D. 552, 567 (N.D. Ga. 1979) (finding that, although the sequestration rule may be invoked during a deposition and at trial, "Rule 615 does not apply between deposition and trial"); see also Thun v. Maine, No. 09-cv-85, 2009 WL 2366052, at *15 (D. Me. July 28, 2009) ("There is clear authority that a witness's review of another witness's testimony at a prior trial while a sequestration order is in effect may well violate the order.  It is not at all clear, at least in Maine, that Rule 615 authorized such sequestration orders *between* trials." (citation omitted)); Lumpkin v. Bi-Lo, Inc., 117 F.R.D. 451, 453 (M.D. Ga. 1987) ("Plaintiff may not rely upon Rule 615 to have the excluded party 'sequestered' between the time of Plaintiff's deposition and trial.").[15]

---

[14]      That the Government invoked the sequestration rule at the 2016 Hearing shows it did not believe the sequestration order from the 2015 Hearing was still in effect.

[15]      Defendant's citation to United States v. Jimenez, 780 F.2d 975 (11th Cir. 1986) is inapposite.  There, the court found a sequestration rule violation where a witness read another witness' testimony, from a prior mistrial, "on the morning after the sequestration order was given" in the retrial.  Id. at 980.  Here, Dilworth's review of Bisker's prior testimony occurred after the 2015 Hearing concluded but before the sequestration rule was invoked at the 2016 Hearing.

Even if Dilworth's review of the first pages of Bisker's 2015 Hearing testimony violated the sequestration rule, or the purpose of the rule, Defendant "suffered no prejudice as a result" and the Court thus declines to strike Dilworth's testimony.  United States v. Bizzard, 674 F.2d 1382, 1389 (11th Cir. 1982).  The first ten pages of Bisker's testimony address events that occurred before Dilworth arrived at the Complex.  Dilworth did not testify about these events.  The Court, as the fact-finder in this matter, also had the opportunity to fully evaluate Dilworth's testimony, including his credibility.  The Court finds Dilworth credible and uninfluenced by his limited review of Bisker's prior testimony, including because the officers' testimonies were not entirely consistent.[16]

    B.    Fourth Amendment

        1.    Introduction

The Fourth Amendment protects individuals from unreasonable searches or seizures.  U.S. Const. Amend. IV.  Evidence obtained in violation of the Fourth

---

[16]    Defendant argues "it is reasonable to infer that the Government also provided the hearing transcript to Officer Bisker."  ([71] at 5).  Bisker testified that he prepared for the 2016 Hearing by reviewing "the case notes from the last hearing."  (2016 Tr. at 32).  Defendant did not follow up on this statement and did not request to see the notes.  Defendant now suggests the "case notes" may have been the 2015 Hearing Transcript.  Defendant has not shown that Bisker violated the sequestration rule, that he or the Government "connived" to violate the rule, or that the claimed violation resulted in "actual prejudice" to Defendant.  See Jimenez, 780 F.2d at 980.

Amendment must be suppressed.  United States v. Gilbert, 942 F.2d 1537, 1541 (11th Cir. 1991).  The Eleventh Circuit has identified three types of police-citizen encounters, each subject to a different level of scrutiny under the Fourth Amendment:  "(1) brief, consensual and non-coercive interactions that do not require Fourth Amendment scrutiny; (2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied; and (3) technical arrests, full-blown . . . custodial detentions that lead to a stricter form of Fourth Amendment scrutiny."  States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003) (citations omitted); see United States v. Jordan, 635 F.3d 1181, 1185 (11th Cir. 2011) (identifying the following types of encounters:  "(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests.").

The first type of encounter, a consensual encounter, does not implicate the Fourth Amendment because it does not involve a seizure.  Jordan, 635 F.3d at 1185.  "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets."  United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003).  A seizure occurs where a reasonable person would not "feel free to decline the officers' requests or otherwise terminate the encounter."  Brendlin v. California, 551 U.S. 249, 255 (2007) (internal quotation

marks omitted) (quoting <u>Florida v. Bostick</u>, 501 U.S. 429, 435-36 (1991)); <u>see</u> <u>United States v. Perez</u>, 443 F.3d 772, 777-78 (11th Cir. 2006) ("If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.").  In determining whether a law enforcement officer has seized a person under the Fourth Amendment, courts consider the totality of the circumstances, including "whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police."  <u>Jordan</u>, 635 F.3d at 1186 (quoting <u>Perez</u>, 443 F.3d at 778).  A consensual encounter does not become a seizure simply because an officer asks for identification or for consent to conduct a search.  <u>See</u> <u>United States v. Drayton</u>, 536 U.S. 194, 201 (2002) ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means."); <u>Bostick</u>, 501 U.S. at 435 (same).

The second type of police-citizen encounter is an investigatory stop. "[L]aw enforcement officers may seize a suspect for a brief, investigatory <u>Terry</u> stop where (1) the officers have a reasonable suspicion that the suspect was

involved in, or is about to be involved in, criminal activity, and (2) the stop 'was

reasonably related in scope to the circumstances which justified the interference in

the first place.'"  Jordan, 635 F.3d at 1186 (quoting Terry v. Ohio, 392 U.S. 1,

19-20 (1968)).  "While reasonable suspicion is a less demanding standard than

probable cause and requires a showing considerably less than preponderance of the

evidence, the Fourth Amendment requires at least a minimal level of objective

justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 123 (2000);

see United States v. Mikell, 102 F.3d 470, 475 (11th Cir. 1996) ("[T]he police are

required to articulate some minimal, objective justification for the stop.").

"To determine whether reasonable suspicion exists, the court 'must look at

the totality of the circumstances' of each case to see whether the detaining officer

has a 'particularized and objective basis' for suspecting legal wrongdoing." United

States v. Hunter, 291 F.3d 1302, 1306 (11th Cir. 2002) (quoting United

States v. Arvizu, 534 U.S. 266, 750 (2002)).  "This process allows officers to draw

on their own experience and specialized training to make inferences from and

deductions about the cumulative information available to them that might well

elude an untrained person." Id. (internal quotation marks omitted) (quoting

Arvizu, 534 U.S. at 750).  "The totality of the circumstances must support a

finding of 'specific and articulable facts which, taken together with rational

inferences from those facts, reasonably warrant' the stop and frisk." Id. (quoting Terry, 392 U.S. at 21). "Reasonable suspicion should be examined from the standpoint of the collective knowledge of all officers involved in a stop." United States v. Blackley, 439 F. App'x 803, 805 (11th Cir. 2011). "[T]he concept of reasonable suspicion is somewhat abstract" and is not to be reduced to "a neat set of legal rules." Arvizu, 534 U.S. at 274.

Where reasonable suspicion exists, the officer "may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or dispelling his suspicions." Minnesota v. Dickerson, 508 U.S. 366, 373 (1993). The officer also may conduct a limited search for weapons where the officer "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others." Dickerson, 508 U.S. at 373; see Hunter, 291 F.3d at 1306 ("Once an officer has legitimately stopped an individual, the officer can frisk the individual so long as 'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" (quoting Terry, 392 U.S. at 27)). The search must be "limited in scope to this protective purpose." Adams v. Williams, 407

U.S. 143, 146 (1972); see Dickerson, 508 U.S. at 373 (protective search "must be strictly limited to that which is necessary for the discovery of weapons").[17]

    2.    Analysis

        a)    The Terry Stop

Bisker and Defendant engaged in a consensual conversation at least until Bisker asked Defendant for permission to pat him down for weapons.  The conversation was consensual, and thus not subject to Fourth Amendment scrutiny, because the encounter was brief, Bisker was by himself, he did not unholster his gun, he asked Defendant routine questions about who he was and where he lived, and Bisker did not touch Defendant or block his path.  See Jordan, 635 F.3d at 1186 (listing factors relevant to when a seizure occurs).  The Court finds, and the parties do not dispute, that, during this initial conversation, a reasonable person in

---

[17]    The third type of police-citizen encounter is an arrest.  Defendant does not challenge his arrest.  "[A]n arrest conducted in a public place must be supported by probable cause, but it does not require a warrant."  McClish v. Nugent, 483 F.3d 1231, 1238 (11th Cir. 2007).  "Probable cause to arrest exists when the totality of the facts and circumstances support a reasonable belief that the suspect had committed or was committing a crime."  United States v. Lindsey, 482 F.3d 1285, 1291 (11th Cir. 2007).  Probable cause requires "reasonably trustworthy information," not overwhelmingly convincing evidence.  Marx v. Grumbinner, 905 F.2d 1503, 1506 (11th Cir. 1990).

Defendant's position "would feel free to terminate the encounter."  Perez, 443 F.3d at 777-78.[18]

The Court assumes for the purposes of this analysis that the consensual conversation became an investigatory Terry stop when Bisker asked Defendant for permission to pat him down for weapons.  The Court also determines that reasonable suspicion had developed by the time Bisker requested Defendant's permission to conduct a frisk.  The officers' interaction with Defendant occurred at night, in a high-crime area, at the location of reported gunfire, shortly after the shots were reported.  See Hunter, 291 F.3d at 1306 (in determining whether reasonable suspicion existed, courts may consider "an individual's proximity to illegal activity" and "[t]he reputation of an area for criminal activity").  The officers had not received a description of any suspects, the officers did not see anyone else in the Complex, the area where Defendant stood "was probably the most remote place" in the Complex, and there was a nearby vehicle with a smashed windshield.

When Bisker asked Defendant where he lived, Defendant became defensive, did not answer the question directly, pointed to Building 2, and said his mother

---

[18]    Before the 2016 Hearing, the parties agreed, and the Magistrate Judge found, that the Terry stop began when the officers asked Defendant to raise his hands so the officers could pat him down for weapons.  ([42] at 10; [45] at 16; R&R at 8).

lived there.  See Jordan, 635 F.3d at 1187 ("Defensive behavior toward police is a

relevant factor in [the reasonable suspicion] inquiry.").  Defendant's personal

identification did not verify that he lived in the Complex.  When Bisker asked

Defendant for his mother's apartment number, Defendant declined to answer the

question.  See Wardlow, 528 U.S. at 124 ("[E]vasive behavior is a pertinent factor

in determining reasonable suspicion.").  This led Bisker to believe "that maybe

[Defendant] didn't live there or that he may have been lying that his mother lived

there."  Bisker testified that Defendant's "mannerisms, swaying, and just his

overall demeanor made me think that possibly he . . . wasn't supposed to be there."

These facts, taken together, establish the necessary "minimal level of objective

justification for making the stop."  Wardlow, 528 U.S. at 123.  The officers had a

reasonable suspicion that Defendant "was involved in, or [was] about to be

involved in, criminal activity."  Jordan, 635 F.3d at 1186.

        b)    The Terry Search

An officer may conduct a limited search for weapons where he "is justified

in believing that the individual whose suspicious behavior he is investigating at

close range is armed and presently dangerous to the officer or others."  Dickerson,

508 U.S. at 373.  "The officer need not be absolutely certain that an individual is

armed; the issue is whether a reasonably prudent person in the circumstances

would be warranted in the belief that his safety or that of others is in danger." Blackley, 439 F. App'x at 805.

The Court already has found that the officers reasonably suspected Defendant was involved in the reported gunfire.  This renders reasonable the officers' belief that Defendant was armed and dangerous.  The reasonableness of that belief is bolstered by Defendant's conduct after the Terry stop began.  When Bisker asked Defendant for permission to "pat him down" for weapons, Defendant's demeanor changed significantly.  He became defensive and tense, he did not answer the question, he looked uncomfortable, and his hands became animated as he spoke.  When Dilworth asked Defendant to raise his hands, Defendant repeatedly moved his hands up and down, which made Bisker suspicious that Defendant "wanted to get his hands towards his waist to hold a weapon."  Based on his "reading [of] the situation," including Defendant's rigid standing position, Dilworth believed that Defendant had a gun in the back of his waistband.  The officers, at this point, were permitted to conduct a limited search for weapons on Defendant's person.  Cf. Arvizu, 534 U.S. at 750 (courts must "allow[] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person").

26

Approaching from Defendant's front-right side, Dilworth "reached out

towards [Defendant's] waistband with an open palm to touch the outer clothing."

Dilworth then removed a weapon from the small of Defendant's back.  This search

was permissible, including because it was "limited to that which is necessary for

the discovery of weapons."  <u>Dickerson</u>, 508 U.S. at 373.  The officers subjected

Defendant to a lawful investigatory stop and frisk.  The evidence obtained from

this <u>Terry</u> stop is admissible at trial.[19]

---

[19]      There is some suggestion in the record that Dilworth reached directly into
Defendant's waistband and recovered the gun without first patting or feeling
Defendant's outer clothing.  (<u>See</u> 2016 Tr. at 82 ("I didn't pat him down. . . .  In
my mind, I knew where a gun was.").  Even assuming the record requires this
conclusion, Defendant does not argue it is material.  Even if he did, and assuming
Dilworth recovered the gun without first conducting a pat-down, the Court still
would find Dilworth's limited search permissible under <u>Terry</u>.  "<u>Terry</u> does not in
terms limit a weapons search to a so-called 'pat-down' search.  Any limited
intrusion designed to discover guns, knives, clubs or other instruments of assault
are [sic] permissible."  <u>United States v. Reyes</u>, 349 F.3d 219, 225 (5th Cir. 2003)
(internal quotation marks omitted) (quoting <u>United States v. Hill</u>, 545 F.2d 1191,
1193 (9th Cir.1976)); <u>see</u> <u>United States v. Monroe</u>, No. 3:11-cr-278-34, 2012 WL
3639041, at *4 (M.D. Fla. May 15, 2012) (same); <u>see also</u> <u>United States v. Baker</u>,
78 F.3d 135, 138 (4th Cir. 1996) ("[A] patdown frisk is but one example of how a
reasonable protective search may be conducted.").  "[T]he policeman's action in
reaching to the spot where the gun was thought to be hidden constituted a limited
intrusion designed to insure his safety, and [the Court] conclude[s] that it was
reasonable" under <u>Terry</u>.  <u>Adams v. Williams</u>, 407 U.S. 143, 148 (1972); <u>cf.</u> <u>Reyes</u>,
349 F.3d at 225 ("[T]he raising of a suspect's shirt by a law enforcement officer
does not violate the boundaries established in <u>Terry</u>."); <u>United States v. Edmonds</u>,
948 F. Supp. 562, 567 (E.D. Va. 1996) ("Officer Kantor's request to Edmonds that
he lift his shirt, as well as Officer Kantor's subsequent lifting of the shirt, were

IV.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Magistrate Judge Catherine M. Salinas'

Report and Recommendation [53] regarding Defendant's Motion to Suppress

Evidence [16] is **NOT ADOPTED**.[20]

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress

Evidence [16] is **DENIED**.

**SO ORDERED** this 22nd day of December, 2016.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

---

both the functional equivalent of a permissible 'frisk' under <u>Terry</u> and its
progeny."), <u>aff'd,</u> 149 F.3d 1171 (4th Cir. 1998).
[20]   The Court's prior Order [58] adopted the Magistrate Judge's
recommendation that Defendant's Motion to Suppress Statements [17] be denied.